UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA

-v-

No. 21-CR-537-LTS

KENDALL JACKSON,

Defendant.

-------------------------------------------------------x

# OPINION AND ORDER ON VIOLATION OF SUPERVISED RELEASE

UNITED STATES ATTORNEY'S OFFICE, SDNY
By: Jacob Harris Gutwillig
Bridget Gaines Johnston
One Saint Andrew's Plaza
New York, NY 10007

*Attorneys for United States of America*

FEDERAL DEFENDERS OF NY, INC.
By: Neil Peter Kelly
Hana Yamahiro
52 Duane Street
Ste 10th Floor
New York, NY 10007

*Attorneys for Defendant Kendall Jackson*

LAURA TAYLOR SWAIN, CHIEF UNITED STATES DISTRICT JUDGE

On October 7, 2026, the Court held an evidentiary hearing regarding seven alleged violations of supervised release, Specifications 2-3 and 12-16, charged in a July 29, 2026, second amended violation report (the "Report") prepared by the United States Probation Office ("Probation"). Having observed the witnesses' testimony and reviewed thoroughly the admitted evidence and the parties' submissions, the Court finds that the Government has met its burden of proving, by a preponderance of the evidence, the supervised release violations charged in Specifications 2, 12, 13, 14, and 15, but has not met its burden with respect to Specification 16.[1]

## I. BACKGROUND

On January 4, 2023, defendant Kendell Jackson[2] pleaded guilty to conspiring to distribute narcotics in violation of 21 U.S.C. section 846. On May 24, 2023, the Court sentenced Mr. Jackson to 27 months of imprisonment followed by a three-year term of supervised release. (Docket entry no. 93 ("Judgment") at 1-3.) The Court later granted Mr. Jackson's motion for a reduction of his sentence pursuant to 18 U.S.C. section 3582(c)(1)(A)(i), after which he was released into New York state custody to serve the remainder of a concurrent state sentence. (Docket entry no. 126, at 8-9.) Mr. Jackson's term of supervised release, which began on January 15, 2025, included the mandatory condition that he must not commit another local, state,

---

1 See infra page 3 for summaries of the violations charged in the enumerated Specifications. Because the Government indicated following the hearing that it "is not proceeding on Specification 3" (docket entry no. 191 ("Gov't Mem.") at 2 n.2), the Court does not address the factual or legal sufficiency of the evidence pertaining to that charge.

2 Although Mr. Jackson was indicted as Kendall Jackson (docket entry no. 1) and the caption so reads accordingly, he has consistently informed the Court that the proper spelling of his first name is "Kendell" (see, e.g., docket entry no. 105, at 3).

or federal crime and the standard condition that he follow the instructions of the Probation Officer. (Judgment at 3-4.)

On the morning of November 23, 2025 (the "November 2025 Incident"), during Mr. Jackson's term of supervised release, New York City Police Department ("NYPD") officers arrested Mr. Jackson after an altercation with a female alleged victim ("Victim-1"). (Report at 5.) Mr. Jackson was again arrested in connection with an incident that allegedly took place on the morning of March 22, 2026 (the "March 2026 Incident").[3] (Id. at 10.) Another female alleged victim, Amanda Martin, complained that Mr. Jackson followed her into a bathroom at a lounge and choked her during the March 2026 Incident.

On July 29, 2026, the Court's Probation Office issued the operative second amended violation report, charging twenty-one violations of supervised release. In relevant part, the Report charges Mr. Jackson with committing various state crimes and violating other conditions of his supervised release in connection with the November 2025 and March 2026 Incidents, including:

- Specification 2: Unlawful imprisonment in the second degree, in violation of New York Penal Law section 135.05;
- Specification 3: Assault with intent to cause physical injury in the third degree, in violation of New York Penal Law section 120.00;
- Specification 12: Strangulation in the second degree, in violation of New York Penal Law section 121.12;
- Specification 13: Aggravated criminal contempt, in violation of New York Penal Law section 215.52;
- Specification 14: Aggravated family offense, in violation of New York Penal Law section 240.75;
- Specification 15: Criminal contempt in the first degree, in violation of New York Penal Law section 215.51(b)(v); and
- Specification 16: Failing to follow the instructions of the Probation Office.

---

[3] As the Government acknowledges, the Report incorrectly states this date as March 23, 2026. (Gov't Mem. at 1 n.2.) The parties agree that the purported incident occurred on March 22, 2026. (Id.; docket entry no. 190 ("Def. Mem.") at 7.)

(Report at 4-10.) Specifications 2 and 3 relate to the November 2025 Incident, and Specifications 12 through 16 relate to the March 2026 Incident.

At a hearing on October 7, 2026, the parties presented witness testimony, documentary evidence, and body-worn camera ("BWC") footage from responding NYPD officers relating to the Incidents. (See generally docket entry no. 185 ("Hrg. Tr.").) The Government called Amanda Martin and Probation Officer Kyro King as witnesses, and the defense called Robert Jack, Mr. Jackson's cousin, as a witness. The parties also filed post-hearing submissions. (See docket entry no. 191 ("Gov't Mem."); docket entry no. 190 ("Def. Mem.").) In its submission, the Government informed the Court that it would not be proceeding on Specification 3. (Gov't Mem. at 1-2 n.2.)

## II. Discussion

### A. Legal Standard

The Government bears the burden of proving, by a preponderance of the evidence, that Mr. Jackson violated the conditions of his supervised release as charged. 18 U.S.C.A. § 3583(e)(3) (Westlaw through P.L. 119-138). "Because the defendant already stands convicted of a crime, the government is not 'put to the burden of an adversarial criminal trial.'" United States v. Diaz, 986 F.3d 202, 208 (2d Cir. 2021) (quoting United States v. Carlton, 442 F.3d 802, 809 (2d Cir. 2006)). Rather, "the very purpose of a supervised release revocation hearing is to determine the gravity of the breach of trust committed by the defendant in the context of the 'conditional liberty' [he] was granted following [his] conviction of the underlying offenses." United States v. Ramos, 979 F.3d 994, 1001 (2d Cir. 2020) (quoting United States v. Wynn, 786 F.3d 339, 343 (4th Cir. 2015)). Federal Rule of Criminal Procedure 32.1 entitles a defendant to certain rights at such revocation hearings, including "an opportunity to appear,

present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." Fed. R. Crim. P. 32.1(b)(2)(C).

B. Factual Findings

Upon careful observation and review of the in-court testimony of Ms. Martin, Officer King, and Mr. Jack, as well as video and documentary evidence offered by the parties and admitted by the Court that is summarized below, the Court makes the following factual findings.

1. November 2025 Incident (Specification 2)

As shown by NYPD BWC footage, on the morning of November 23, 2025, NYPD officers accompanied Victim-1 to her car, where she, visibly upset and excited, described a verbal and physical altercation with Mr. Jackson that she said had taken place in the car earlier that day. (See generally GX 11 at 19:45-29:53.)[4] Victim-1 explained that she and Mr. Jackson had left a party and that Mr. Jackson had invited her back to his home. (Id. at 21:28-35.) When she refused, Victim-1 stated that Mr. Jackson "proceeded to hold [her] in the car for three hours" and refused to give her the car keys. (Id. at 21:35-50; see also id. at 23:15-20 ("I've been held without my will, without my consent for three hours.").) She also alleged that Mr. Jackson had smacked her cell phone out of her hands so that she could not call anyone. (Id. at 22:15-19; 23:00-05.) She informed the officers that Mr. Jackson had stated that she "could never break up with him" and that he "has control over everything." (Id. at 22:19-23.) She also stated that Mr. Jackson "made fake 311 calls trying to get [her] fired from [her] teacher's job," explaining to the

[4] The Court admitted this portion of Government Exhibit 11 under the excited utterance exception to the rule against hearsay. (See docket entry no. 182, at 3-5.) The parties stipulated that Government Exhibits 11 and 12 are true and correct copies of BWC footage from NYPD officers. (Hrg. Tr. at 21:3-6.)

responding officers that "that's why [she] ran." (Id. at 22:23-40.) The Court, having observed Victim-1's statements and demeanor as depicted on the BWC footage, finds credible her statements that she was held in the car against her will by Mr. Jackson.

Victim-1 informed the officers that she had an order of protection against Mr. Jackson in the past. (Id. at 24:30-35.) She responded "yes" to certain questions posed by the officers, including whether Mr. Jackson had threatened her or her children before, whether Mr. Jackson had ever strangled or choked her before, and whether Mr. Jackson had beaten her four years ago. (Id. at 24:35-25:15.) As she departed, Victim-1 declined medical services, stating, "I'm okay, I just was held hostage. I'm okay physically." (Id. at 29:00-10.)

NYPD officers also spoke with Mr. Jackson that morning. He stated to the officers that he "can argue with [Victim-1] any time of the day, simple" and asked, "What crime is it? Cuz I didn't want to get out of the car? And I wanted to keep talking?" (GX 12 at 4:10-30.) Mr. Jackson recounted that Victim-1 "said get out," but he explained to the officers that the car would be left open if she walked away. (Id. at 4:30-4:45.) He further stated, "We sat here for three hours arguing." (Id. at 4:45-47.)

Based on the audiovisual evidence admitted during the hearing, the Court finds Victim-1's statements, as captured in Government Exhibit 11, to be credible.

The video evidence belies Mr. Jackson's contentions that Victim-1 was unreliable, uncooperative, and inconsistent. Victim-1, though upset, speaks lucidly and without difficulty when repeatedly alleging that Mr. Jackson held her hostage for three hours in her vehicle. Rather than being uncooperative, Victim-1 stated that she had repeated her claims to the police multiple times and nonetheless proceeded to repeat her claims again when asked to do so. (GX 11 at 23:02-10 ("I'm shaking. I just want to go home, please. I've given you this story five

times.”).) Mr. Jackson also argues that “the real reason” Victim-1 reported Mr. Jackson was because of the fake 311 calls he allegedly made to jeopardize Victim-1’s status at work (Def. Mem. at 2), but nothing in the video suggests that those calls were the exclusive reason for Victim-1’s report. Rather, Victim-1 consistently asserted that Mr. Jackson did not allow her to leave her car for three hours, in addition to slapping her phone out of her hand and making fake 311 calls. Even Mr. Jackson’s own statements to the police support this finding. He admitted that he “wanted to keep talking,” that he and Victim-1 “sat here for three hours arguing,” and that Victim-1 told him to “get out.” (GX 12 at 4:25-50.) The Court finds Victim-1’s statements that Mr. Jackson held her in the car against her will, as captured in Government Exhibit 11, credible.

2. March 2026 Incident (Specifications 12-16)

On the night of Saturday, March 21, 2026, into the early morning of Sunday, March 22, 2026, Ms. Martin went out to several establishments located in Harlem. A recent graduate of the New York City Police Academy, Ms. Martin had been in a romantic relationship with Mr. Jackson from approximately 2012 to 2021, and the two share a child. (Hrg. Tr. at 25:18-26:13.) Ms. Martin recalled having approximately three to five alcoholic drinks in the course of the night and early morning, but testified that her memory of the night remained clear. (Id. at 27:19-22, 29:15-20, 67:16-19.)

At approximately 5:00 AM on March 22, 2026, Ms. Martin arrived at a location colloquially known as “the Spot,” an event space on 116th Street in Harlem. (Hrg. Tr. at 30:3-6; GX 2 at 0:41-1:00.)[5] Mr. Jackson arrived at the Spot approximately a half-hour later. (Hrg. Tr.

[5] The parties stipulated to Government Exhibit 2 as a true and correct copy of surveillance footage taken outside the Spot, with the exception that the timestamp depicted on the video is approximately eleven minutes slow. (Hrg. Tr. at 20:22-21:2.) References to the

at 37:24-38:18; GX 2 at 1:30-48.) At approximately 6:15 AM, Ms. Martin left the Spot briefly to get cash from an ATM at a nearby convenience store. (Hrg. Tr. at 34:16-35:20; GX 2 at 2:12-35.) After returning to the Spot, Ms. Martin witnessed a confrontation among a group of men in the Spot. (Hrg. Tr. at 39:7-40:10.) She testified that she moved out of the way and went to a bathroom that was on the same floor of the Spot. (Id. at 40:11-21.)

Ms. Martin related the events underlying Specifications 12 through 15 as follows. As Ms. Martin walked into the bathroom, she felt someone push her into a stall. (Id. at 40:22-41:1.) She turned and saw Mr. Jackson, who then proceeded to choke her, push her against the toilet, and call her a "bitch" and a "police bitch." (Id. at 41:2-25.) With his hand still on Ms. Martin's throat, and as she yelled at him to let her go, Mr. Jackson kissed her. (Id. at 42:1-11.) He eventually stopped kissing her, released his grip, and left the bathroom. (Id. at 42:19-22.) Ms. Martin followed him out of the bathroom and proceeded to scream at him. (Id. at 42:23-43:11.) Ms. Martin testified that Mr. Jack (who, as noted above, is Mr. Jackson's cousin) was present during this verbal dispute; Mr. Jack later testified that he had not seen any such confrontation and that he had been with Ms. Martin during her entire time at the Spot. (Id. at 43:12-13; 126:9-18.) Mr. Jackson took Ms. Martin's phone out of her hands while she was screaming at him, and, after she retrieved it from him during the confrontation, she felt a seizure coming. (Id. at 44:1-20.) Ms. Martin testified that anxiety or stress may cause her to suffer seizures that result in her body freezing up and a loss of mobility in her tongue. (Id. at 45:4-10.) She was unable to speak or move for approximately one to two minutes during the seizure that night. (Id. at 45:20-22.)

time of day, with regard to Government Exhibit 2, are accordingly recited here as eleven minutes later than the times shown on the footage.

After her seizure ended, Ms. Martin went back to the bathroom and hailed a rideshare vehicle on her phone. (Id. at 46:1-16; see GX 3.) At approximately 8:30 AM, Ms. Martin left the Spot and entered the rideshare vehicle. (Hrg. Tr. at 47:1-48:2; GX 2 at 9:05-30.) Ms. Martin testified that, after she had returned to her home and fallen asleep, she experienced pain in her neck and back, limiting her ability to move her neck and to lay on her side. (Hrg. Tr. at 48:8-23.) She then sent a text message to Mr. Jackson, complaining that her neck was bruised and sore. (Id. at 49:11-50:6; see GX 4.)

When Ms. Martin arrived at the police academy on the morning of Monday, March 23, she reported the incident with Mr. Jackson to her supervisor. (Hrg. Tr. at 50:7-24.) In so doing, she estimated that the attack had taken place at 3:00 AM, but she testified at the hearing that she realized that it had occurred later in the night once she was able to view the surveillance video footage taken outside of the Spot. (Id. at 51:17-52:18.) Officers at the academy took photographs of Ms. Martin, which she says depict light bruising and swelling. (Id. at 53:7-56:21; see GX 14-16.) As a result of her injuries, Ms. Martin was sent home early from the academy because she was not "fit for duty," and she received medical attention. (Hrg. Tr. at 56:23-57:7.) Ms. Martin testified that she was unable to complete the physical activities of running and working out that were required for training and could not participate in academy workouts again until approximately one to two weeks later. (Id. at 57:8-58:21.)

The Court, based on its observation and evaluation of Ms. Martin's testimony in the context of all of the evidence, finds credible Ms. Martin's testimony that Mr. Jackson attacked her in the bathroom, squeezing her neck and pushing her against the toilet. The Court does not find credible Mr. Jack's testimony that he was with Ms. Martin during every minute of her time at the Spot and that no such incident occurred.

Mr. Jackson argues that Ms. Martin's testimony should not be credited, pointing to various alleged inconsistencies in her testimony, but each of his claims is either insignificant or unfounded. The defense argues that Ms. Martin should not be believed because of her drinking, but Ms. Martin testified to having consumed at most five drinks over more than eleven hours on the night in question, and, contrary to Mr. Jackson's argument, the video evidence does not depict her as "visibly intoxicated." (See generally GX 2.) The defense also argues that it is not plausible that Ms. Martin suffered an attack in a small bar without anyone intervening to help her. But her allegations place the attack in an enclosed bathroom, out of the sight of the bar's patrons. The lack of intervention in the verbal confrontation that followed does not undermine her testimony either — bystanders may not have wished to intrude on an intense verbal feud. Other alleged inconsistencies, including the precise time of the attack, the number of text messages shared with law enforcement, and whether Ms. Martin ran or walked up the stairs leading outside of the bar when she left to meet her rideshare vehicle, do not detract from the credible evidence that corroborates Ms. Martin's account, including surveillance footage, medical treatment, and the uncontroverted testimony that the attack rendered her unfit to perform her duties at the police academy for several days.

The defense also points to testimony of Mr. Jack that contradicts Ms. Martin's account of the events of the evening in several respects, but his testimony was often fanciful and thus unreliable and not credible in material respects. Mr. Jack testified, and video evidence showed, that he and Ms. Martin were at the same bar prior to meeting again at the Spot. (Hrg. Tr. at 120:13-18; DX 82 at 37:15-20.) The evidence does not, however, support Mr. Jack's repeated assertions that he was with Ms. Martin "every second of the night" once he arrived at the Spot. (Hrg. Tr. at 132:9-11; see id. at 133:15-23.) The video evidence reveals that there

were multiple periods during which Ms. Martin and Mr. Jack were not together. (See GX 2 at 1:30-47 (Mr. Jack arriving at the Spot with Mr. Jackson at approximately 5:30 AM); id. at 2:15-3:09 (Ms. Martin temporarily leaving the Spot at approximately 6:20 AM).) Mr. Jack's testimony also suggested that he only saw Mr. Jackson when Ms. Martin left the Spot. (Hrg. Tr. at 134:15-16 ("Amanda left in the morning. That's when I seen Mr. Jackson.").) Yet video evidence shows that Mr. Jack and Mr. Jackson entered the Spot together earlier in the morning. (GX 2 at 1:30-47.)

Having observed the witnesses carefully and weighed their evidence in the context of the entire record, the Court finds that the Government has proven by a preponderance of the evidence that Ms. Martin's account is credible in all material respects, and finds that Mr. Jack's insistence that he had uninterrupted observation of Ms. Martin at all times and saw none of the activity to which she testified not credible.

C. Conclusions of Law Regarding Violation Charges

1. Specification 2: Unlawful Imprisonment in the Second Degree

Specification 2 charges Mr. Jackson with violating the conditions of his supervised release by committing a state crime, unlawful imprisonment in the second degree, in violation of New York Penal Law section 135.05, on November 23, 2025, by keeping Victim-1 locked in a car for three hours. (Report at 4.) For the reasons set forth below, the Court finds that the Government has proven Specification 2 by a preponderance of the credible evidence.

New York Penal Law section 135.05 provides that "[a] person is guilty of unlawful imprisonment in the second degree when he restrains another person." N.Y. Penal Law § 135.05 (McKinney). Restraint, as relevant here, is defined by New York law as "restrict[ing] a person's movements intentionally and unlawfully in such manner as to interfere substantially

with his liberty . . . by confining him . . . in the place where the restriction commences." Id. § 135.00(1). The Government was therefore required to prove: (1) that Mr. Jackson restricted Victim-1's movements in such manner as to interfere substantially with her liberty by confining Victim-1 in the car; (2) that he did so without her consent; (3) that he did so intentionally; and (4) that the restriction of Victim-1's movement was unlawful, and Mr. Jackson knew that the restriction was unlawful.

After considering the video and documentary evidence, the Court concludes that the record establishes, by a preponderance of the evidence, that Mr. Jackson restrained Victim-1 in violation of section 135.05. First, Victim-1 credibly and repeatedly alleged that Mr. Jackson trapped her in her car for three hours. (See GX 11 at 21:20-40.) This confinement meets the definition of restraint under New York law. See People v. Leonard, 970 N.E.2d 856, 859 (N.Y. 2012) ("A restriction on movement, and an interference with 'liberty,' should be deemed to exist whenever the lawful movement of a person . . . is hindered."); Jamison v. Superintendent, Auburn Corr. Facility, No. 10-CV-3440-MKB, 2015 WL 8770079, at *11 (E.D.N.Y. Dec. 14, 2015) (involving similar restraint in a car).

The Court also concludes that this restraint was without Victim-1's consent. New York law clarifies that "[a] person is so moved or confined 'without consent' when such is accomplished by . . . physical force, intimidation or deception." N.Y. Penal Law § 135.00(1)(a). Victim-1 stated unequivocally that this restraint was without her consent, describing how she was "held without [her] will, without [her] consent for three hours" and that she was "held hostage." (GX 11 at 23:15-20, 29:05-07.) She also described how Mr. Jackson used physical force to confine her, explaining to the officers that Mr. Jackson had slapped her phone out of her hands to prevent her from calling for help. (Id. at 23:00-05.) Regarding Mr. Jackson's verbal

conduct, Victim-1 recounted how Mr. Jackson stated that she "could never break up with him" and that he "had control over everything," as well as his fake 311 calls. (Id. at 22:19-40.) These statements, especially in the context of Mr. Jackson's prior assaults of Victim-1 that she relayed to the officers (see id. at 24:35-25:15), would be likely to coerce Victim-1 into remaining in the car without her consent. See People v. Amazon, 383 N.Y.S.2d 686, 687-88 (3d Dep't 1976) (noting that prior assaults against a victim were probative as to whether her restraint was without consent). Mr. Jackson's physical and verbal conduct thus further demonstrates that Victim-1's continued presence in the car was nonconsensual. Contrary to the defense's contention that "the record is void of any evidence whatsoever that Mr. Jackson used physical force, intimidation, or deception" (Def. Mem. at 4), the record indicates that Mr. Jackson used physical force and intimidation, as detailed above, to restrain Victim-1 without her consent.

Lastly, regarding Mr. Jackson's intent, "it is well settled that intent may be inferred from the act itself, or 'from the defendant's conduct or the surrounding circumstances.'" People v. Laramore, 764 N.Y.S.2d 299, 299 (2d Dep't 2003) (quoting People v. Bracey, 360 N.E.2d 1094, 1098 (N.Y. 1977)). Mr. Jackson's conduct, including slapping a cell phone out of Victim-1's hands to prevent her from contacting anyone, evinces an intent to restrain Victim-1. For similar reasons, the circumstances surrounding Victim-1's restraint also make clear that Mr. Jackson knew that this restraint was unlawful. His protests to the police that he had a right to argue with Victim-1 and keep her talking for three hours, and his challenge to the police to explain why that was a crime, suggest that he was conscious that his conduct was both wrongful and contrary to her will. Victim-1's credible account, the key elements of which recurred in Victim-1's report to the police immediately following a traumatic incident, are thus sufficient to establish the legal elements of a violation of section 135.05, as charged in Specification 2.

For the foregoing reasons, the Court finds that the Government has proven by a preponderance of the evidence that Mr. Jackson committed the crime of unlawful imprisonment in the second degree in violation of section 135.05, and thus that he committed the violation described in Specification 2.

2. Specification 12: Strangulation in the Second Degree

Specification 12 charges Mr. Jackson with violating the conditions of his supervised release by committing the state crime of strangulation in the second degree, in violation of New York Penal Law section 121.12, on March 22, 2026, when he followed Ms. Martin into a bathroom and choked her. (Report at 9.) For the reasons set forth below, the Court finds that the Government has proven Specification 12 by a preponderance of the evidence.

New York Penal Law section 121.12 provides that "[a] person is guilty of strangulation in the second degree when he or she commits the crime of criminal obstruction of breathing or blood circulation, as defined in section 121.11 of this article, and thereby causes stupor, loss of consciousness for any period of time, or any physical injury or impairment." N.Y. Penal Law § 121.12. Section 121.11 in turn provides that criminal obstruction of breathing or blood circulation requires that a person, "with intent to impede the normal breathing or circulation of the blood of another person, . . . applies pressure on the throat or neck of such person; or . . . blocks the nose or mouth of such person." Id. § 121.11. The Government was therefore required to prove, by a preponderance of the evidence, (1) that Mr. Jackson applied pressure on the throat or neck of Ms. Martin; (2) that he did so with the intent to impede the normal breathing or circulation of the blood of Ms. Martin; and (3) that he thereby caused stupor, loss of consciousness for any period of time, or any other physical injury or impairment to Ms. Martin.

After considering the record as a whole, including documentary evidence together with the witnesses' testimony, the Court concludes that the record establishes by a preponderance of the evidence that Mr. Jackson, after shoving Ms. Martin into a bathroom stall from behind, applied pressure to Ms. Martin's throat and neck with the intent to impede her breathing or blood circulation. (See Hrg. Tr. at 41:1-42:20.) "The inference that he intended to obstruct the [v]ictim's breathing is sufficiently supported by both [his] specific actions, and the context in which he acted." United States v. Anderson, No. 13-CR-414-LTS, 2026 WL 34974, at *4 (S.D.N.Y. Jan. 6, 2026).

Because Ms. Martin disclaimed losing consciousness as a result of the pressure and did not mention stupor (Hrg. Tr. at 42:3-4), the pertinent inquiry is whether Mr. Jackson caused Ms. Martin physical injury or impairment. New York law defines "physical injury" as "impairment of physical condition or substantial pain." N.Y. Penal Law § 10.00(9). "While the Penal Law requires no particular degree of physical impairment or substantial pain under the definition of physical injury, . . . to sustain a conviction, there must be evidence establishing the one or the other." People v. McDowell, 270 N.E.2d 716, 717 (N.Y. 1971) (citations omitted). Here, both physical impairment and substantial pain have been proven by a preponderance of the evidence.

The New York Court of Appeals has characterized "substantial pain" as "more than slight or trivial pain" but noted that it need not be "severe or intense." People v. Chiddick, 866 N.E.2d 1039, 1040 (N.Y. 2007). Relevant factors include the objective level and duration of injury, the victim's subjective description of what he or she felt, whether the victim sought medical treatment, and the motive of the assailant. See United States v. Graves, 466 F. App'x 56, 57 (2d Cir. 2012); Nunez v. Conway, 923 F. Supp. 2d 557, 566 (S.D.N.Y. 2013). Courts

have also considered the degree to which a victim is able to resume normal activities after the injury in question, including employment activities. See Graves, 466 F. App'x at 58 (affirming finding of physical injury based on witness's report of substantial pain and her absence from work for a week); People v. Callaghan, 633 N.Y.S.2d 46, 47 (2d Dep't 1995) (noting victim's testimony of his absence from work for one week due to the assault); People v. Wooden, 713 N.Y.S.2d 415, 416 (4th Dep't 2000) (same).

The Government proffered objective evidence of Ms. Martin's injuries. Ms. Martin sought medical treatment and took ibuprofen to alleviate her pain and soreness. (Hrg. Tr. at 56:23-58:12). Additionally, Ms. Martin testified, and the defense does not contest, that she was sent home from the police academy due to her inability to participate in required workouts, which persisted for one to two weeks. (Id. at 58:15.) Medical treatment and impaired employment activities have been recognized as objective indicators of substantial pain by New York courts. See, e.g., Chiddick, 866 N.E.2d at 1040 ("It is also relevant that [the victim] sought medical treatment for the wound defendant inflicted — an indication that his pain was significant."); People v. Mack, 755 N.Y.S.2d 437, 439 (3d Dep't 2003) (noting pain medication prescription and missing work when justifying conclusion of substantial pain).

The Government also introduced Ms. Martin's subjective description of her pain. Ms. Martin testified that she woke up the day after the attack "sore and bruised around [her] neck and [her] back," reported difficulty moving and laying on her side, and described the sensation as "[p]ainful, very painful." (Hrg. Tr. at 48:13-23.) She reported similar symptoms directly to Mr. Jackson in her text message to him on that day. (GX 4.) When she attempted to complete the required workouts at the academy, she testified that she experienced "[s]harp pain in [her] back" and "stiffness of [her] neck." (Hrg. Tr. at 58:6.) Similar subjective descriptions of limitations

due to pain from an attack have sufficed to establish substantial pain as well. See, e.g., In re Veronica R., 702 N.Y.S.2d 23, 24 (1st Dep't 2000) ("There was ample evidence establishing the element of physical injury, in that as a result of the attack, the complainant suffered a swollen neck, scratches and pain that limited her mobility for five to seven days."); People v. Gurley, 812 N.Y.S.2d 527, 527-28 (1st Dep't 2006) ("Evidence that the [victim] sustained a small abrasion to his knee, suffered soreness to his back, knee and wrist, and was absent from work for three days as a result, was sufficient to establish the element of physical injury.").

The record also demonstrates that Ms. Martin's physical condition was impaired. "Unlike 'substantial pain,' the phrase 'impairment of physical condition' is not well defined in the case law," People v. Hallman, 255 N.Y.S.3d 695 (N.Y. Crim. Ct. 2026), but "impairment of physical condition does not require a victim's incapacitation or serious and protracted impairment," People v. Hodge, 921 N.Y.S.2d 71, 73 (1st Dep't 2011) (citing People v. Tejeda, 578 N.E.2d 431, 432 (N.Y. 1991)). The statute's drafters, however, noted that physical injury (and thus impairment of physical condition) excluded such things as "petty slaps, shoves, kicks and the like." In re Philip A., 400 N.E.2d 358, 359 (N.Y. 1980) (quoting N.Y. State Comm'n on Revision of the Penal L. & Crim. Code, Proposed New York Penal Law at 330 (1964)). New York courts have looked to the dictionary definition of "impair," meaning "to damage or make worse by or as if by diminishing in some material respect." People v. Estevez, 1 N.Y.S.3d 777, 782 & n.13 (N.Y. Sup. Ct. 2015), aff'd, 42 N.Y.S.3d 799 (1st Dep't 2016); see also People v. Ortiz, 263 N.Y.S.3d 396 (N.Y. Crim. Ct. 2026). Therefore, the Government may prove the physical injury element of strangulation in the second degree by showing that the victim's physical condition was damaged, worsened, or diminished by conduct that went beyond "petty slaps, shoves, kicks and the like."

Here, the credible testimony establishes that Mr. Jackson applied pressure sufficient to cause her to perceive bruising, swelling, and pain, and Ms. Martin presented uncontroverted testimony regarding her reduced mobility and inability to participate in employment activities, which falls squarely within the plain meaning of "impairment of physical condition." Ms. Martin testified that she was found not "fit for duty" and could not "participate in the physical part of the [work] day," including running, mandatory workouts, and other exercises. (Hrg. Tr. at 57:9-24.) Ms. Martin further testified that she was unable to participate in such workouts for one to two weeks. (Id. at 58:13-15.) In fact, injuries similar to those suffered by Ms. Martin have been found to constitute impairments of physical condition. For example, in People v. Soto, the Second Department held that a victim's injured ankle, which "remained swollen and tender when walking for about three or four days after the incident," constituted an impairment of physical condition within the meaning of physical injury. 584 N.Y.S.2d 877, 878 (2d Dep't 1992). Because the injuries Ms. Martin suffered from Mr. Jackson's attack impaired her physical condition and caused her substantial pain, the physical injury requirement for strangulation in the second degree is satisfied.

The defense claims that "copious objective evidence contradicts [Ms. Martin's] claims of injury" (Def. Mem. at 16), but each argument falls flat. The defense first suggests that Ms. Martin's failure to immediately seek medical treatment cuts against a finding of physical injury. Yet New York courts have concluded that even a lack of medical treatment altogether is "but a factor to consider in resolving such issues, for pain is subjective and different persons tolerate it differently." People v. Guidice, 634 N.E.2d 951, 954 (N.Y. 1994) (citation omitted). Ms. Martin's delay of a few days to seek medical treatment, a fortiori, cannot foreclose a finding of physical injury. The defense also suggests that photographic evidence and the reactions of

responding officers show a lack of injury, but other objective indicia, including Ms. Martin being sent home from work and her inability to take part in employment activities, provide the necessary foundation for a finding of physical injury.

For the foregoing reasons, the Court finds that the Government has proven by a preponderance of the evidence that Mr. Jackson committed strangulation in the second degree in violation of section 121.12, and thus that he committed the violation described in Specification 12.

3. Specification 13: Aggravated Criminal Contempt

Specification 13 charges Mr. Jackson with violating the conditions of his supervised release by committing the state crime of aggravated criminal contempt, in violation of New York Penal Law section 215.52, on March 22, 2026, when he violated a duly served order of protection. (Report at 9.) For the reasons set forth below, the Court finds that the Government has proven Specification 13 by a preponderance of the evidence.

As relevant here, New York Penal Law section 215.52 provides:

> [A] person is guilty of aggravated criminal contempt when . . . in violation of a duly served order of protection, or such order of which the defendant has actual knowledge because he or she was present in court when such order was issued, or an order of protection issued by a court of competent jurisdiction in another state, territorial or tribal jurisdiction, he or she intentionally or recklessly causes physical injury or serious physical injury to a person for whose protection such order was issued . . . .

N.Y. Penal Law § 215.52. The parties have stipulated that, on August 7, 2023, Mr. Jackson was duly served with an order of protection issued by a New York state court for the protection of Ms. Martin, which ordered Mr. Jackson to "stay away from" Ms. Martin and "refrain from any criminal offense against" Ms. Martin, and that the order of protection is effective until and including August 6, 2031. (Hrg. Tr. at 21:11-17.) The Government was further required to

prove, beyond a preponderance of the evidence, that Mr. Jackson caused physical injury to Ms. Martin in violation of the order of protection and that he did so intentionally or recklessly.

For the reasons discussed above in the context of Specification 12, the Court concludes that Mr. Jackson caused physical injury to Ms. Martin intentionally. See People v. Peterson, 988 N.Y.S.2d 271, 274-75 (3d Dep't 2014) (comparing elements of strangulation in the second degree and aggravated criminal contempt). Therefore, the Court finds that the Government has proven by a preponderance of the evidence that Mr. Jackson committed aggravated criminal contempt in violation of section 215.52, and thus that he committed the violation described in Specification 13.

4. Specification 14: Aggravated Family Offense

Specification 14 charges Mr. Jackson with violating the conditions of his supervised release by committing the state crime of aggravated family offense, in violation of New York Penal Law section 240.75, on March 22, 2026. (Report at 9.) Section 240.75 provides that "[a] person is guilty of aggravated family offense when he or she commits a misdemeanor defined in subdivision two of this section as a specified offense and he or she has been convicted of one or more specified offenses within the immediately preceding five years." N.Y. Penal Law § 240.75(1). The defendant and the persons against whom the specified offenses were committed must be members of the same family or household, id. § 240.75(2), terms that are defined to include "persons who have a child in common," N.Y. Crim. Proc. Law § 530.11(1)(d). The parties have stipulated that Mr. Jackson was convicted of criminal contempt in the first degree, in violation of New York Penal Law section 215.51, on August 7, 2023, in connection with an offense against Ms. Martin. (Hrg. Tr. at 21:7-10.) Criminal contempt in the

first degree is one of the specified offenses listed in section 240.75. N.Y. Penal Law § 240.75(2).

The Government must further prove, by a preponderance of the evidence, (1) that Mr. Jackson committed an additional specified offense against Ms. Martin, and (2) that the two were members of the same family or household. The Government alleges that Mr. Jackson committed the specified offense of criminal obstruction of breathing or blood circulation, in violation of New York Penal Law section 121.11. (Gov't Mem. at 12-13.) As relevant here, criminal obstruction of breathing or blood circulation requires a defendant to have applied pressure on the throat or neck of a victim with the intent to impede the normal breathing or blood circulation of that victim. See N.Y. Penal Law § 121.11.

For the reasons discussed above in the context of Specification 12, the Court concludes that Mr. Jackson applied pressure on the throat or neck of Ms. Martin with the intent to impede her normal breathing or blood circulation. As New York courts have recognized, criminal obstruction of breathing or blood circulation is a lesser included offense of strangulation in the second degree. See People v. Pisano, 208 N.Y.S.3d 189, 190 (2d Dep't 2024); supra section II.C.2. It is undisputed that Ms. Martin and Mr. Jackson share a child, making them members of the same household for purposes of aggravated family offense. (Hrg. Tr. at 26:2.) Therefore, the Court finds that the Government has proven by a preponderance of the evidence that Mr. Jackson committed an aggravated family offense in violation of section 240.75, and thus that he committed the violation described in Specification 14.

5. Specification 15: Criminal Contempt in the First Degree

Specification 15 charges Mr. Jackson with committing criminal contempt in the first degree, in violation of New York Penal Law section 215.51(b)(v), on March 22, 2026, in

that he violated an order of protection with intent to harass, annoy, or threaten Ms. Martin. (Report at 10.) Section 215.51(b)(v) states that a person is guilty of criminal contempt in the first degree when a person, "in violation of a duly served order of protection . . . with intent to harass, annoy, threaten or alarm a person for whose protection such order was issued, strikes, shoves, kicks or otherwise subjects such other person to physical contact or attempts or threatens to do the same." N.Y. Penal Law § 215.51(b)(v). As previously discussed, the parties stipulated that Mr. Jackson was subject to an order of protection issued for Ms. Martin's protection. Therefore, the Government was further required to prove, by a preponderance of the evidence, (1) that Mr. Jackson struck, shoved, kicked, or otherwise subjected Ms. Martin to physical contact; (2) that he did so with intent to harass, annoy, threaten, or alarm Ms. Martin; and (3) that he did so in violation of the order of protection.

For the reasons discussed above in the context of Specification 12, the Court concludes that Mr. Jackson subjected Ms. Martin to physical contact with the intent to harass, annoy, threaten, or alarm her. In addition to intentionally impeding her normal breathing or blood circulation, Mr. Jackson called Ms. Martin derogatory names as he choked her, further demonstrating an intent to harass, annoy, threaten, or alarm. (Hrg. Tr. at 41:24-25.) Lastly, the stipulated order of protection required Mr. Jackson to "stay away" from Ms. Martin, a directive he clearly violated. The Court therefore finds that the Government has proven by a preponderance of the evidence that Mr. Jackson committed criminal contempt in the first degree in violation of section 215.51(b)(v), and thus that he committed the violation described in Specification 15.

6. Specification 16: Failing to Follow the Instructions of the Probation Office

Specification 16 charges Mr. Jackson with failing "to turn himself in immediately to the 28th Precinct in response to an i-Card." (Report at 10.) One of the conditions of Mr. Jackson's supervision states that he "must follow the instructions of the probation officer related to the conditions of supervision." (Judgment at 4.) The parties have stipulated that, on March 31, 2026, Officer King instructed Mr. Jackson to report to the precinct regarding an open NYPD investigation card and that Mr. Jackson did so on April 14, 2026. (Hrg. Tr. at 21:18-22.)

The Government argues that these stipulated facts establish this alleged violation of supervised release. (Gov't Mem. at 14.) However, the Government has not proffered any evidence suggesting that Officer King specifically directed Mr. Jackson to turn himself in immediately, or that Officer King's directive was not ultimately followed. Although, for reasons previously articulated by the Court, Mr. Jackson's delay in reporting to the precinct was troubling (docket entry no. 161, at 45), the Government did not introduce any evidence suggesting that this delay was tantamount to fully disregarding the Probation Office's instructions. Because there is no evidence of a directive to comply within a particular timeframe or some other context that implicitly required a more immediate action, the Government has failed to prove, by a preponderance of the evidence, that Mr. Jackson violated his conditions of supervision in the manner charged in Specification 16.

## III. CONCLUSION

For the foregoing reasons, the Court finds that the Government met its burden of proving that Mr. Jackson committed the supervision violations charged in Specifications 2, 12, 13, 14, and 15. The Government's evidence, however, is insufficient to sustain the charge in Specification 16, which is hereby dismissed.

The Government previously requested that Specification 4, which charged Mr. Jackson with failing to truthfully answer inquiries of the Probation Officer regarding the November 2025 Incident, be held in abeyance pending rulings on Specifications 2 and 3, and has abandoned Specification 3. (Docket entry no. 178, at 2 n.1; Gov't Mem. at 2 n.2.) The Court hereby directs the parties to meet and confer and to provide a joint status update by November 23, 2026, regarding the Government's position on whether it intends to proceed with any or all of the remaining specifications.

SO ORDERED.

Dated: New York, New York
November 16, 2026

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge